SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Kevin Malanga v. Township of West Orange** (A-45-21) (086087)

**Argued October 24, 2022 -- Decided March 13, 2023**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the Township of West Orange improperly designated the site of the West Orange Public Library as an area in need of redevelopment under the Local Redevelopment and Housing Law (LRHL).

At a 2018 meeting of the Township Council, the Mayor and Council discussed a proposed resolution to investigate whether the Library -- which attracted tens of thousands of visitors and was used more than 150,000 times a year -- qualified as an area in need of redevelopment. The Mayor explained that, without the designation, "to sell public property or to look to develop it, you'd have to auction it off to the highest bidder. . . . And we would lose control of the process." The township attorney's explanation was similar. A broader plan to build affordable senior housing above the existing Library was also discussed at the meeting. The Council adopted resolutions directing the Planning Board to investigate whether the Library qualified as an area in need of redevelopment under the LRHL and authorizing the Township to retain Heyer, Gruel & Associates (HGA) to conduct the evaluation.

HGA issued a report in February 2019 concluding that the Library qualified as an area in need of redevelopment under N.J.S.A. 40A:12A-5(d). In language that mirrors the statute, HGA found "substantial evidence to demonstrate that the library property exhibits faulty arrangement, obsolescence, and an obsolete layout which has a detrimental effect on the overall welfare of the community." Relying on a variety of sources, HGA found that the Library's age, physical deficiencies, and lack of space rendered the Library "unable to adequately provide . . . services" to the public. HGA further concluded that the Library's conditions were "detrimental to the welfare of the Township" because they "inhibit[] the provision of essential services that promote equity, education, and a sense of community." In other words, HGA found that even though the Library is "functional" and "actively provid[es] services to Township residents," its "physical limitations . . . prevent it from offering the programs, technology, and function that the community desires," and from living "up to the benchmark standard of modern libraries."

1

In March 2019, the Planning Board held a public hearing. An HGA consultant provided a brief overview of the study and the redevelopment process. The consultant noted that "the physical condition of the building, even though it's functioning, is somewhat obsolete, and it requires substantial improvements to adequately serve the residents of West Orange." The author of the report also reiterated the conclusion that the Library lacks space to provide the programming, computers, and facilities associated with modern libraries.

In response to questions about what was faulty with the arrangement of the Library, the consultant said, "[the] study area has limited privacy and it's very cramped. That is a faulty arrangement. The teen area . . . is very cramped . . . . That's faulty arrangement." The consultant was also asked whether the presence of asbestos posed a health hazard to patrons and ultimately stated the Library was safe for patrons to visit despite the capped asbestos. Plaintiff Kevin Malanga posed questions about data from library benchmarks provided by the Institute of Museum and Library Services (IMLS), which compared the Library to other libraries and found it was "poorly ranked" in certain areas. The consultant declined to question the IMLS's methodology "or second guess[] how they evaluated their libraries." On the issue of safety, a voting member of the Board noted that the façade had fallen off one wall of the Library and "emergency repair work was done."

Some residents remarked that if the Library qualified as an area in need of redevelopment, many buildings in the Township would be eligible as well. Others disagreed with HGA's conclusion that the Library posed a detriment to the welfare of the community. A Planning Board member picked up on that theme and stated, "[t]he comment about being a detriment to public welfare . . . means that we are adequately meeting all of the needs of the community and . . . we could do better."

The Planning Board agreed with HGA's findings and unanimously recommended "[t]hat the Township Council designate the [Library site] as an area in need of redevelopment." By a vote of 3 to 2, Council members approved a resolution that deemed the Library site "to be a Redevelopment Area pursuant to the" LRHL. Months later, the Township reached an agreement with West Orange Senior Housing, LLC to redevelop the Library site.

Malanga filed an action to challenge the designation of the Library site as a redevelopment area. The trial court rejected Malanga's claims, noting the designation was entitled to a presumption of validity and was clearly supported by substantial credible evidence. The Appellate Division credited the trial court's analysis and affirmed substantially for the reasons in the court's written decision.

The Court granted plaintiff's petition for certification in March 2022. 250 N.J. 162 (2022). The following month, the Township adopted a resolution

2

authorizing the sale of the Library to a private developer, West Orange Senior Housing, LLC, to build low- and moderate-income senior housing on the Library site. The resolution relies on a different statutory provision -- N.J.S.A. 40A:12-21(*l*) -- to authorize the sale but does not address or rescind the Township's prior designation of the Library as an area in need of redevelopment.

**HELD:** Like many older buildings, the Library needed improvements in a number of areas. But the record did not establish that it suffered from obsolescence, faulty arrangement, or obsolete layout in a way that harmed the welfare of the community. To designate property for redevelopment under the LRHL, a municipality must demonstrate that certain specified problems exist and that they cause actual detriment or harm. There is insufficient evidence in the record to meet that standard. The designation of the Library as an area in need of redevelopment is invalid.

1. Defendants argue that the appeal is moot in light of the recent Resolution for the sale of the Library site to a private developer under N.J.S.A. 40A:12-21(*l*). Yet the Township conceded at oral argument that the earlier Resolution designating the Library site as an area in need of redevelopment is still in force and that, if the closing on the planned sale falls through, the Township would want that designation to remain in place. The appeal is therefore not moot at this time. (pp. 18-19)

2. Under N.J.S.A. 40A:12-13(c), towns can sell public property to a private developer "when acting in accordance with the" LRHL. Except as otherwise noted in the Court's opinion, the Township relied on that provision to redevelop the Library under the LRHL. The same standards for redevelopment -- namely, the criteria in N.J.S.A. 40A:12A-5 -- apply to private and public property. The LRHL outlines the process to determine whether an area is "in need of redevelopment" -- a phrase synonymous with "blighted." See N.J.S.A. 40A:12A-6. The central question when a municipality seeks to redevelop property is whether a proposed area meets any of the eight sets of criteria listed in N.J.S.A. 40A:12A-5(a) to (h). (pp. 19-22)

3. This appeal centers around the meaning of subsection N.J.S.A. 40A:12A-5(d), which the Township relied on to make its designation. Subsection (d) requires two things: (1) sufficient proof that areas with buildings or improvements suffer from "dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors"; and (2) sufficient proof that, as a result of the particular condition or conditions, the areas "are detrimental to the safety, health, morals, or welfare of the community." In subsection (e) of N.J.S.A. 40A:12A-5, the Legislature took a forward-looking approach that invites comparisons between property as it exists today and what that property might become. The Court reviews its interpretation of subsection (e) in Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 191 N.J. 344 (2007),

3

and the subsequent legislative amendment to the statute codifying that interpretation. The Court finds the difference in language the Legislature selected for subsections (d) and (e) revealing. Subsection (d) is stricter in two ways. First, it does not ask whether property could potentially be more useful or valuable; it requires proof of a current problem, such as "dilapidation," "obsolescence," or "overcrowding." Second, subsection (d) does not presume harm; it requires a showing of actual detriment. Additionally, as is the case with subsection (e), proof that a property is not used in an optimal manner or that it could function better is not an independent basis for redevelopment under subsection (d). (pp. 22-27)

4. The Township relied on specific parts of subsection (d) for its redevelopment designation. A town's designation of an area as in need of redevelopment is entitled to deference provided it is supported by substantial evidence on the record. The Court therefore considers whether substantial evidence supports the Township's conclusion that (1) the Library suffered from "obsolescence," "faulty arrangement," or "obsolete layout"; and (2) as a result of one or more of those conditions, the designated area was detrimental to the welfare of the community. The Township does not suggest the Library posed harm to the "health" or "safety" of the community. (pp. 27-29)

5. After reviewing in detail relevant dictionary definitions and case law, the Court concludes that the record lacks substantial evidence the Library suffered from "obsolescence." Both HGA's consultant and the Mayor recognized the Library was a functioning building. And members of the community actively used it more than 150,000 times a year. As a result, it can hardly be said that the Library was "no longer in use" or "falling into disuse." The HGA report and architect's study, to be sure, identified various conditions in the Library that needed improvements or upgrades, none of which presented code violations or posed a hazard, including the presence of capped asbestos. The fact that an older building needs repair work does not necessarily mean it is out of date or obsolete. The same is true for completed repair work -- in this case, repairs to the brick façade in 2015. Changes in style or design standards, likewise, do not necessarily establish obsolescence. (pp. 29-33)

6. As to the other phrases in subsection (d) on which the Township relies, the Court reviews the record evidence in detail and notes that whether there is sufficient proof of "faulty arrangement" or an "obsolete layout" is a close question. Even if the evidence on that point is considered substantial, however, the record would still have to establish that, as a result of either condition, the Library site was "detrimental to the . . . welfare of the community." N.J.S.A. 40A:12A-5(d). (pp. 33-35)

7. Reviewing definitions of "detriment" and "detrimental," the Court underscores that N.J.S.A. 40A:12A-5(d) requires a showing of actual harm; it cannot be presumed. HGA concluded that "[t]he obsolescence of the library building is

4

detrimental to the welfare of the Township because it inhibits the provision of essential services that promote equity, education, and a sense of community." But a close look at the IMLS data on which HGA relied in reaching that conclusion raises serious questions about whether the Library was compared to other single libraries or to library systems in municipalities with multiple library branches, and no record evidence explains otherwise. The record thus does not contain substantial credible evidence that shows how the Library compared to its peers and, in particular, how its programming and the number of computers it had compared to other libraries. Defendants do not suggest that a shortfall of computers alone could justify a finding of obsolescence. Their argument is tied to the building's physical limitations, which allegedly prevented the Library from offering more computers. No one can quarrel with the general point that additional computers and programming at the Library could serve the community better. But that does not demonstrate that the building was causing actual harm, as the statute requires. To the extent the evidence bore directly on detriment, needed repair work does not necessarily establish actual harm. The Township promptly repaired the brick façade that collapsed in 2015, and the record contains no evidence the problem was likely to recur. Similarly, HGA's consultant acknowledged the Library was safe to visit despite the presence of capped asbestos. The record lacks substantial evidence that the conditions of the Library were detrimental to the community's welfare. (pp. 35-41)

8. In this matter, Township officials offered certain reasons at the outset for pursuing a redevelopment designation: to avoid the public bidding process and keep control over the project. The Court does not base its judgment on those motives and does not suggest the comments reflect bad faith. Noting both the important benefits of public bidding and the difficulties that can arise if property is not sold to the developer whose plan had been approved by the redevelopment agency or governing body, the Court observes that towns faced with situations like the one here have a number of options. Among others, they can make needed improvements to public property. They can invite bids for construction projects subject to particular specifications. And they can designate areas in need of redevelopment provided they satisfy the specific standards in the LRHL. (pp. 41-42)

**REVERSED.**

**JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE and JUDGE SABATINO (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.**

5

SUPREME COURT OF NEW JERSEY
A-45 September Term 2021
086087

Kevin Malanga,

Plaintiff-Appellant,

v.

Township of West Orange, Township of
West Orange Planning Board and
Township of West Orange Township Council,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| October 24, 2022 | March 13, 2023 |

James M. Turteltaub argued the cause for appellant (The Turteltaub Law Firm, attorneys; James M. Turteltaub, of counsel and on the briefs).

Richard D. Trenk argued the cause for respondents (Trenk Isabel Siddiqi & Shahdanian, attorneys for respondents Township of West Orange and Township of West Orange Township Council; and Porzio, Bromberg & Newman, attorneys for respondents Township of West Orange, Township of West Orange Township Council, and Township of West Orange Planning Board; Richard D. Trenk, Vito A. Gagliardi, Jr., and Kenneth D. McPherson, of counsel and on the joint briefs).

1

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, we consider whether the Township of West Orange improperly designated the site of its public library as an area in need of redevelopment under the Local Redevelopment and Housing Law (LRHL), N.J.S.A. 40A:12A-1 to -49.

Under the LRHL, property that (1) suffers from "obsolescence," "faulty arrangement," or "obsolete layout," and, (2) as a result, is "detrimental to the . . . welfare of the community" can be found "to be in need of redevelopment." N.J.S.A. 40A:12A-5(d). Such a designation in this case would empower the Township to take down the library and redevelop the site, working with a private developer of its choosing.

The West Orange Public Library (Library) was built in 1959 and expanded in 1979. Amidst the debate about whether it was obsolete and detrimental to the community, the Library attracted tens of thousands of visitors and was used more than 150,000 times a year.

Here, the Planning Board hired a consulting firm to evaluate the Library. The firm concluded the Library met both statutory conditions listed above. The Board, in turn, adopted that conclusion and recommended the site of the

Library be designated an area in need of redevelopment. The Township Council agreed.

Plaintiff Kevin Malanga, who lives in West Orange, filed a lawsuit to challenge the designation. The trial court rejected his arguments and dismissed the complaint, and the Appellate Division affirmed.

We find that the Township's designation was not supported by substantial evidence in the record. Like many older buildings, the Library needed improvements in a number of areas. But the record did not establish that it suffered from obsolescence, faulty arrangement, or obsolete layout in a way that harmed the welfare of the community.

At the core of the Township's arguments is a claim that even though the Library actively provided services to the residents of West Orange, it could have better served the public if it had more programming and computers, among other things. That laudable concept, by itself, does not satisfy the standards in the LRHL. To designate property for redevelopment under the law, a municipality must demonstrate that certain specified problems exist and that they cause actual detriment or harm. Because there is insufficient evidence in the record to meet that standard and designate the Library an area in need of redevelopment, we reverse the judgment of the Appellate Division.

3

## I.

The West Orange Public Library is a two-story, approximately 25,000-square-foot building.  It is part of a larger municipal complex that includes the Town Hall building, a police facility, and offices for various departments of local government.

As noted below, the Library site is in a state of flux at this time based on other development plans that are not part of this appeal.  Throughout this opinion, we address the Library's status during the period leading up to March 2019, when the Township designated the site as an area in need of redevelopment.

## A.

At a meeting of the Township Council on November 27, 2018, the Mayor and Council discussed a proposed resolution to investigate whether the Library qualified as an area in need of redevelopment.  During the meeting, a member of the Council asked why it was necessary to assess whether public property "fits the criteria of an area in need of redevelopment."  In response, the Mayor explained that, without the designation, "to sell public property or to look to develop it, you'd have to auction it off to the highest bidder. . . . And we would lose control of the process."  The township attorney added that "[i]f you dispose of" public property, in general, the law "would require you to

4

just put it on [the] block, and then you lose total control"; a redevelopment designation "is the only way you will decide what is going to happen to the future of that site, and . . . by whom."

During the meeting, a broader plan to build affordable senior housing was also discussed. The Mayor stated that a developer had already assessed the Library site at his own expense and determined it would be possible to "build five stories of steel construction above the existing Library"; that space could potentially accommodate seventy-five units of senior housing. Under such a plan, the Mayor explained, according to "engineers and architects who [had] looked at this . . . , the library doesn't have to be displaced."

The Council adopted Resolution 266-18 at the meeting, which directed the Township of West Orange Planning Board to investigate whether the Library qualified as an area in need of redevelopment under the LRHL.[1] Another resolution adopted the same day authorized the Township to retain Heyer, Gruel & Associates (HGA), a consulting firm, to conduct the evaluation.

---

[1] The study area in the original resolution encompassed more than the Library site; a resolution adopted six weeks later limited the area to the Library site alone. The site includes the Library and a small amount of adjacent land. Because the redevelopment process focused primarily on the Library building, we use the terms "Library" and "Library site" interchangeably to refer to the area designated in need of redevelopment in 2019.

B.

HGA completed its study and issued a report on February 6, 2019. It concluded the Library qualified as an area in need of redevelopment under N.J.S.A. 40A:12A-5(d).[2] In language that mirrors the statute, HGA found "substantial evidence to demonstrate that the library property exhibits faulty arrangement, obsolescence, and an obsolete layout which has a detrimental effect on the overall welfare of the community."

HGA based its evaluation on tax maps, aerial photos, field inspections, and interviews, among other sources. It also relied on studies and reports that had been prepared previously: (1) the West Orange Library Improvement Study (2015) (Architect's Study); (2) an Asbestos Survey and Sampling Report (2018) (Asbestos Report); (3) the 2014 Digital Inclusion Survey (2015) (Digital Inclusion Survey); (4) library benchmarks provided by the Institute of

---

[2] The statute provides that an "area may be determined to be in need of redevelopment" if "any of the following conditions is found":

> (d) Areas with buildings or improvements which, by reason of dilapidation, <u>obsolescence</u>, overcrowding, <u>faulty arrangement</u> or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or <u>obsolete layout</u>, or any combination of these or other factors, are <u>detrimental to the</u> safety, health, morals, or <u>welfare of the community</u>."

> [(emphases added).]

6

Museum and Library Services (IMLS); and (5) the West Orange Public Library Strategic Plan 2016-2019 (2016) (Strategic Plan).

HGA found that the Library's age, physical deficiencies, and lack of space provided evidence of obsolescence, faulty arrangement, and obsolete layout. Because of those conditions, according to HGA, the Library was "unable to adequately provide . . . services" to the public. HGA further concluded that the Library's conditions were "detrimental to the welfare of the Township" because they "inhibit[] the provision of essential services that promote equity, education, and a sense of community."

In other words, HGA found that even though the Library is "functional" and "actively provid[es] services to Township residents," its "physical limitations . . . prevent it from offering the programs, technology, and function that the community desires," and from living "up to the benchmark standard of modern libraries."

To demonstrate the Library's physical deficiencies, HGA relied heavily on the Architect's Study and the Asbestos Report. The purpose of the Architect's Study, prepared by Arcari + Iovino Architects in 2015, was to identify building improvements needed over the next five years. The Study identified about $1.675 million in improvements related to the Library's brick façade (which partially collapsed in 2015 and was repaired), lighting, the fire

alarm and detection system, HVAC system, roofing work for the original building, ceiling tiles, kitchen appliances, electrical equipment, and compliance with the Americans with Disabilities Act (ADA), among other areas.

The Asbestos Report, prepared by Garden State Environmental in 2018, identified materials that contained asbestos on the exterior and interior of the building, and advised that the materials would need to be abated before any renovations that might disturb them. HGA noted that asbestos is common in buildings of the Library's age and poses "a potential health risk."

HGA acknowledged that the various physical deficiencies identified in the studies could be addressed but stated the proposed improvements "[would] not expand the usable area of the building in a meaningful way." HGA relied on other studies to conclude the Library had insufficient space and a faulty layout, and to assess the effect of those conditions on the availability of services, programming, and technology.

The Digital Inclusion Survey, prepared by the Information Policy and Access Center in 2015, discussed the function of libraries in general in an increasingly digital world. It found that libraries play an essential role in helping members of the community (1) "understand the benefits of advanced information and communication technologies"; (2) "access . . . high-speed

8

Internet-connected devices and online content"; and (3) "take advantage of the educational, economic, and social opportunities . . . facilitated by these technologies." According to the Survey, libraries can promote "digital inclusion" by providing computers and access to Wi-Fi; offering educational programs on computer and Internet use; and teaching digital skills.

The Digital Inclusion Survey stated that "[a] library's ability to provide these services is closely related to the quality of its infrastructure." More pointedly, the Survey noted that "libraries are significantly more likely to offer certain types of services to patrons if their buildings have been constructed or renovated within the last five years." "Smaller and older libraries," the Survey concluded, "tend to offer fewer services . . . and programs that lead to more digitally inclusive communities."

Drawing from those observations, HGA found that "[w]ithout substantial upgrades or reconfiguration, the physical constraints of the building prevent the library from offering the full range of modern tools and programs that promote digital inclusion."

HGA also analyzed the IMLS benchmarks that provide data and allow libraries to compare themselves to their peers. The IMLS is an independent federal agency that supports libraries and museums through grantmaking, research, and policy development. Inst. of Museum & Libr. Servs.,

9

https:/www.imls.gov (last visited Mar. 8, 2023).  It gathers a variety of data on libraries nationwide.  Ibid.  According to HGA, the benchmarks reveal the West Orange Library "has a high number of users, but offers a low number of hours, programs, computers, and materials."  HGA found the Library was "poorly ranked in the number of programs that are offered and the number of computers available," which "speak to the issue of obsolescence and concerns about . . . the provision of essential community services."

HGA additionally identified "physical constraints that speak to [the Library's] faulty arrangement and obsolete layout."  It noted the main floor had "one small meeting room and an undersized teen area"; that the ground floor meeting room was "not well positioned to host regular programs" because of "its distance from staff and physical separation from the main public portion of the library"; and that the Library's age and infrastructure limited its "ability to provide additional computers, charging stations, and other multi-media offerings."

Finally, HGA referred to the Strategic Plan, prepared in 2016 by the Library board, staff, and others, in cooperation with a consulting firm.  The Plan was based, in part, on feedback from focus groups, interviews with community leaders, and survey responses from 417 residents.

Some improvements suggested in response to the survey included "[b]etter lighting," a "[b]etter first impression when entering the building," "[m]ore comfortable seating," "[m]ore convenient parking," a "[l]arger more inviting space for teens," "[q]uiet study areas," and "[s]elf-checkout stations." Less than one-quarter of respondents "felt that the entire building needed to be modernized or significantly refreshed." The Strategic Plan also noted that "Library computers are heavily used" and that patrons wanted more computer time as well as "space . . . to use their own laptops." Sixteen percent of respondents used the Library's computers and twenty percent used the Library's Wi-Fi for personal devices.

According to HGA, the Strategic Plan "indicates that the library space is not sufficient to provide for . . . new demands," including additional programming space, meeting rooms, and technology needs, and is unable to address the needs of the community.

C.

In March 2019, one month after HGA completed its report, the Planning Board held a public hearing. An author of the HGA report, a licensed professional planner, testified at the hearing. The consultant provided a brief overview of the study and the redevelopment process. The consultant noted that "the physical condition of the building, even though it's functioning, is

11

somewhat obsolete, and it requires substantial improvements to adequately serve the residents of West Orange." The author of the report also reiterated the conclusion that the Library lacks space to provide the programming, computers, and facilities associated with modern libraries.

The author then responded to questions from the Planning Board and members of the public, including plaintiff Kevin Malanga. The consultant admitted to having no particular qualifications to evaluate or design libraries. In response to questions about what was faulty about the arrangement of the Library, the consultant said, "[the] study area has limited privacy and it's very cramped. That is a faulty arrangement. The teen area . . . is very cramped . . . . That's faulty arrangement."

The consultant was also asked whether the presence of asbestos posed a health hazard to patrons and ultimately stated the Library was safe for patrons to visit despite the asbestos. The consultant also testified "[t]here was nothing to indicate that" ADA issues posed "an accident hazard."

Malanga posed other questions about data from the IMLS benchmarks, which compared the Library to other libraries. The consultant explained that the criterion used for comparison purposes was whether a facility was "a public library." The consultant declined to question the IMLS's methodology

"or second guess[] how they evaluated their libraries." We discuss the data in greater detail at a later point.

Planning Board members and members of the public also made several comments. On the issue of safety, a voting member of the Board noted that the façade had fallen off one wall of the Library and "emergency repair work was done." The individual added, "[w]ho knows what comes next down the road with the older portion of the library."

Some residents remarked that if the Library qualified as an area in need of redevelopment, many buildings in the Township would be eligible as well. Others disagreed with HGA's conclusion that the Library posed a detriment to the welfare of the community. A Planning Board member picked up on that theme and stated, "[t]he comment about being a detriment to public welfare sounds so harsh and so negative, and to me, it really -- it's just -- it means that we are adequately meeting all of the needs of the community and it could do better -- we could do better."

D.

The Planning Board agreed with HGA's findings and incorporated them in a Board resolution. The resolution concluded that "the physical deficiencies, obsolescence, faulty arrangement of the existing physical facility and their negative impact upon the type of programming that modern libraries

13

are called to provide result in a deleterious impact upon the general welfare of the community." Township of West Orange Planning Board Resolution 19-01, ¶ 6 (Mar. 12, 2019). The Board also found substantial evidence that the Library suffered from an obsolete layout. Id. ¶ 3.

The Board unanimously recommended "[t]hat the Township Council designate the [Library site] as an area in need of redevelopment under" the LRHL. Id. ¶ (i).

Later the same month, the Township Council met and accepted the Board's recommendation. At the outset of the meeting, the Mayor offered his perspective on the advantages of creating a redevelopment zone as compared to selling public property to the highest bidder. By a vote of 3 to 2, Council members then approved a resolution that deemed the Library site "to be a Redevelopment Area pursuant to the" LRHL. Township of West Orange Resolution 99-19, 3 (Mar. 19, 2019). The resolution also authorized the Township to hire HGA to prepare a redevelopment plan for the Library site. Id. at 3-4.

Months later, the Township reached an agreement with West Orange Senior Housing, LLC to redevelop the Library site.

14

E.

Malanga filed an action in lieu of prerogative writs to challenge the Township's designation of the Library site as a redevelopment area. The complaint names the Township of West Orange, the Township Council, and the Planning Board as defendants.

In the complaint, Malanga asserted that the designation of the Library site was not supported by substantial credible evidence and was thus arbitrary, capricious, and unreasonable; was an attempt to circumvent applicable laws, including public bidding laws; and improperly interpreted N.J.S.A. 40A:12A-5. The Township submitted that it properly identified, studied, and designated the Library as an area in need of redevelopment under the LRHL.

The trial court rejected Malanga's claims in a written decision. It noted the designation was entitled to a presumption of validity and was clearly supported by substantial credible evidence. The court recounted the findings of the studies and reports reviewed above and concluded they sustained the designation. In short, the court concluded there was adequate support for the Township to find the Library suffered from "obsolescence" and "constituted a detriment to the public welfare" because "it did not provide essential services that promote equity, education, and a sense of community."

The Appellate Division credited the trial court's analysis and affirmed substantially for the reasons in the court's written decision.

We granted plaintiff's petition for certification on March 11, 2022. 250 N.J. 162 (2022). The following month, the Township adopted Resolution 124-22. It authorized the sale of the Library to a private developer, West Orange Senior Housing, LLC, to build low- and moderate-income senior housing on the Library site. The resolution relies on a different statutory provision -- N.J.S.A. 40A:12-21(*l*)[3] -- to authorize the sale. The resolution does not address or rescind the Township's prior designation of the Library as an area in need of redevelopment.

## II.

Malanga contends the Library's redevelopment designation was improper and was not supported by the record. He submits that the Library, which was fully functional and had 150,000 visitors per year at the time of the designation, was not "falling into disuse" and thus did not suffer from "obsolescence" under N.J.S.A. 40A:12A-5(d). He also argues that an alleged

---

[3] N.J.S.A. 40A:12-21 authorizes the private sale of municipally owned property under certain circumstances. Subsection (*l*) provides for sales to "duly incorporated urban renewal corporation[s] . . . for the purpose of constructing housing for low or moderate income persons or families or persons with disabilities."

16

need for more modern technology and services did not, by itself, cause a "detriment" to the welfare of the community.

Malanga submits that an overly broad reading of the criteria in subsection (d) would "eviscerate the protections of" public bidding laws and "open[] the door" to the sale of public buildings to favored private developers.

Defendants maintain the designation of the Library site for redevelopment was supported by sufficient evidence. They contend that a library's "lack of modern technology" can support a finding of "obsolescence" under subsection (d). They also argue that the Library's obsolescence led to a lack of services which, in turn, failed to promote "equity, education and a sense of community" and was therefore "detriment[al] to the public welfare."

Defendants also dispute the claim that municipalities can circumvent the public bidding process by using the LRHL. They argue the LRHL contains "strict criteria that a municipality must meet in order to designate property" for redevelopment.

The parties disagree on whether this appeal is moot in light of the Township's proposed sale of the Library under Resolution 124-22. They also differ on the scope of this Court's ruling in Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 191 N.J. 344 (2007), which we need not address to resolve this case.

17

III.

We begin with defendants' argument that this appeal is moot.

An issue is considered moot if the ruling sought will "have no practical effect on the existing controversy" when a decision is rendered. Redd v. Bowman, 223 N.J. 87, 104 (2015) (quotation omitted). To avoid resolving abstract legal issues and to preserve judicial resources, courts ordinarily do not address legal questions that have been rendered moot. Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330 (1996). But if an issue raised is a matter of great public interest, our courts will often decline to dismiss an appeal because it is moot. Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 484 (2008); Oxfeld v. State Bd. of Educ., 68 N.J. 301, 303 (1975).

In support of their claim, defendants point to the recent resolution that provides for the sale of the Library site to a private developer under N.J.S.A. 40A:12-21(*l*). Yet the Township conceded at oral argument that Resolution 99-19, which designates the Library site as an area in need of redevelopment, is still in force. The Township represents that the closing on its new plan -- to convey the property to a developer who will build affordable senior housing -- should take place in the near future. Until then, the redevelopment designation will stay in effect. If the closing falls through, as counsel explained, the

18

Township would want the designation to remain in place. The appeal is therefore not moot at this time.

In addition, the proper interpretation of N.J.S.A. 40A:12A-5(d) -- a critical standard for designating property for redevelopment -- is an issue of substantial public importance. We therefore address the merits of this appeal.

IV.

A.

Towns can sell or improve public property in a number of ways. N.J.S.A. 40A:12-13 identifies several of them.[4] Under subsection (a) of the

---

[4] The statute's introductory language is a bit challenging to read at first blush. It states that

> [a]ny county or municipality may sell any real property, capital improvement or personal property . . . not needed for public use . . . other than county or municipal lands, real property otherwise dedicated or restricted pursuant to law, and, except as otherwise provided by law, all such sales shall be made by one of the following methods: . . . .

A fair reading of the text conveys that counties and municipalities may sell the listed forms of property -- aside from real property whose use is limited by law -- but may do so only by one of the methods specified in the statute's subsections. The law's legislative history supports that reading. See S. 283 § 15 (pre-filed for introduction in the 1969 session); Veto Message to S. 283 1, 14 (Nov. 17, 1969) (recommending revisions in the text); S. 283, Third Official Copy Reprint 13; S. 629 § 14 (introduced March 9, 1970); S. Amends. to S. 629 2 (March 9, 1971) (final version of the bill).

19

statute, a town can sell property no longer needed for public use to the highest bidder at an open public auction. N.J.S.A. 40A:12-13(a). Towns can impose conditions on the sale and restrictions on the use of the property under that subsection. Ibid. Towns can also sell public property to a private developer "when acting in accordance with the" LRHL. Id. at (c).[5] Except as otherwise noted, the Township relied on the latter option to redevelop the Library under the LRHL.

The power to redevelop property "is a valuable tool . . . municipalities" have to address "decaying and disintegrating . . . areas" in their communities which have become "blighted." Gallenthin, 191 N.J. at 365; 62-64 Main St., LLC v. Mayor & Council of Hackensack, 221 N.J. 129, 134, 144 (2015). That important power is limited by the Constitution and state law.

The Court reviewed the history of our State's redevelopment authority in Gallenthin, 191 N.J. at 356-59, and 62-64 Main Street, 221 N.J. at 144-47. Article VIII, Section 3, Paragraph 1 of the State Constitution authorizes the taking of private property to "redevelop[] . . . blighted areas" as a public purpose. The Legislature enacted the LRHL, L. 1992, c. 79, and its

_____

[5] The Local Lands and Buildings Law provides other avenues for a municipality to sell public property. See N.J.S.A. 40A:12-1 to -30. As noted earlier, the Township relied on N.J.S.A. 40A:12-21(*l*) when it adopted Resolution 124-22.

20

predecessor, the Blighted Areas Act, L. 1949, c. 187 (codified as amended at N.J.S.A. 40:55-21.1 to -21.14 (repealed 1992)), to implement the Constitution's clause and give meaning to the term "blighted." Gallenthin, 191 N.J. at 357, 62-64 Main St., 221 N.J. at 134-35.

Although this appeal involves public property found to be in need of redevelopment, the LRHL governs the municipality's conduct here as well. See N.J.S.A. 40A:12-13(c) (noting that municipalities may sell property "not needed for public use" by "[a] sale to a private developer . . . when acting in accordance with the [LRHL]"); see also Concerned Citizens of Princeton, Inc. v. Mayor & Council of Princeton, 370 N.J. Super. 429, 460-61 (App. Div. 2004) (noting that "municipally-owned" property may be designated for redevelopment pursuant to any subsection under N.J.S.A. 40A:12A-5); N.J.S.A. 40A:12A-6(c) ("An area determined to be in need of redevelopment pursuant to this section shall be deemed to be a 'blighted area' for the purposes of Article VIII, Section III, paragraph 1 of the Constitution."). The same standards for redevelopment -- namely, the criteria in N.J.S.A. 40A:12A-5 -- therefore apply to private and public property.

The LRHL outlines the process to determine whether an area is "in need of redevelopment" -- a phrase synonymous with "blighted." See N.J.S.A. 40A:12A-6; 62-64 Main St., 221 N.J. at 146 ("The [LRHL] substituted the

21

term 'area in need of redevelopment' for the pejorative term 'blighted area' . . . .").

The statutory process includes, among other steps, public notice, a public hearing, an investigation by the planning board, a recommendation by the planning board to the municipal governing body, a determination by that body whether to designate the area in need of redevelopment, and notice of that finding to property owners within the designated area. N.J.S.A. 40A:12A-6(a), (b). The municipality's determination may be challenged in Superior Court within 45 days. Id. at (b)(7).

The central question when a municipality seeks to redevelop property is whether a proposed area meets any of the conditions listed in N.J.S.A. 40A:12A-5. Section 5 outlines eight sets of criteria. Id. at 5(a) to (h). "[T]here is a degree of overlap" among them, Gallenthin, 191 N.J. at 366, and if one or more are met, an area can be designated in need of redevelopment.

## B.

This appeal centers around the meaning of subsection (d), which the Township relied on to make its designation. When courts interpret the meaning of a statute, the paramount goal is "to determine and give effect to the Legislature's intent." State v. Lopez-Carrera, 245 N.J. 596, 612 (2021) (quoting In re Registrant H.D., 241 N.J. 412, 418 (2020)). A statute's plain

language "is typically the best indicator of intent." Id. at 613 (quoting State v. McCray, 243 N.J. 196, 208 (2020)). Courts also look to other parts of the statute for context. See State v. Twiggs, 233 N.J. 513, 533 (2018); State v. Rangel, 213 N.J. 500, 509, 512-13 (2013).

If the language of a statute is clear, our task is complete. Lopez-Carrera, 245 N.J. at 613; McCray, 243 N.J. at 208. If it is ambiguous, we may consider extrinsic materials, including legislative history. Lopez-Carrera, 245 N.J. at 613.

The Court's "review of the meaning of a statute is de novo." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 564 (2012); see also Dobco, Inc. v. Bergen Cnty. Improvement Auth., 468 N.J. Super. 519, 537 (App. Div. 2021) (interpreting the LRHL), aff'd 250 N.J. 396 (2022); James R. Zazzali & Jonathan L. Marshfield, Providing Meaningful Judicial Review of Municipal Redevelopment Designations:  Redevelopment in New Jersey Before and After Gallenthin Realty Development, Inc. v. Borough of Paulsboro, 40 Rutgers L.J. 451, 495 (2009) ("A municipality's interpretation of the statutory criteria necessary for a redevelopment designation is not entitled to deference and should be reviewed de novo.").

C.

We start with the plain language of N.J.S.A. 40A:12A-5. The relevant part of the statute reads as follows:

> A delineated area may be determined to be in need of redevelopment if, after investigation, notice and hearing as provided in [N.J.S.A. 40A:12A-6], the governing body of the municipality by resolution concludes that within the delineated area any of the following conditions is found:
>
> . . . .
>
> > d. Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.
>
> [N.J.S.A. 40A:12A-5(d).]

The text of subsection (d) thus requires two things: (1) sufficient proof that areas with buildings or improvements suffer from one or more specified conditions; and (2) sufficient proof that, as a result of the particular condition or conditions, the areas "are detrimental to the safety, health, morals, or welfare of the community." Ibid.

Another part of the statute -- subsection (e) -- helps underscore the scope and import of those requirements. See N.J.S.A. 40A:12A-5(e). In subsection

24

(e), the Legislature took a forward-looking approach that invites comparisons between property as it exists today and what that property might become. Subsection (e), in its current form, applies to areas with a

> lack of proper utilization . . . caused by the condition of the title, diverse ownership of the real properties therein or other similar conditions which impede land assemblage or discourage the undertaking of improvements, resulting in a <u>stagnant and unproductive</u> condition of land <u>potentially useful and valuable</u> for contributing to and serving the public health, safety and welfare.
>
> [<u>Ibid.</u> (emphases added).]

In such areas, the statute provides, the "stagnant and unproductive condition" of "potentially useful and valuable" land "is <u>presumed</u> to be having a negative social or economic impact or otherwise being detrimental to the safety, health, morals, or welfare of the surrounding area or the community in general." <u>Ibid.</u> (emphasis added).

The Court considered the requirements of subsection (e) in <u>Gallenthin</u>. At the time of the Court's decision, subsection (e) was broader in scope and applied to areas that were either "stagnant <u>or</u> not fully productive." <u>See</u> N.J.S.A. 40A:12A-5(e) (2007) (emphasis added). Relying on the latter phrase, the Borough of Paulsboro sought to designate property in need of redevelopment solely because it was "not fully productive." <u>Gallenthin</u>, 191 N.J. at 370-72.

25

To save the statute from constitutional infirmity, the Court "presume[d] that the Legislature did not intend the phrase 'stagnant or not fully productive' to create two alternative criteria for designating property as in need of redevelopment." Id. at 368. The Court instead held the phrase "not fully productive" had to be read in conjunction with the word "stagnant." Ibid. Otherwise, the Court observed, subsection (e) "would exceed the meaning of 'blight'" under the Constitution. Ibid.[6] As the Court explained,

> Paulsboro interprets subsection 5(e) to permit redevelopment of any property that is "stagnant or not fully productive" yet potentially valuable for "contributing to and serving" the general welfare. Under that approach, any property that is operated in a less than optimal manner is arguably "blighted." If such an all-encompassing definition of "blight" were adopted, most property in the State would be eligible for redevelopment. . . . At its core, "blight" includes deterioration or stagnation that has a decadent effect on surrounding property. We therefore conclude that Paulsboro's interpretation of N.J.S.A. 40A:12A-5(e), which would equate "blighted areas" to areas that are not operated in an optimal manner, cannot be reconciled with the New Jersey Constitution.
>
> [Id. at 365.]

---

[6] The prior version of subsection (e) also included a catch-all phrase -- "other conditions" -- that was not tethered to conditions of title or diverse ownership. See N.J.S.A. 40A:12A-5(e) (2007). To "avoid rendering" subsection (e) "unconstitutional and give effect to the Legislature's . . . purpose," the Gallenthin Court found the Legislature meant to apply the catch-all phrase "only to property that has become stagnant because of issues of title, diversity of ownership, or other similar conditions." Gallenthin, 191 N.J. at 369 (emphasis added).

26

In response to Gallenthin, the Legislature later amended subsection (e) to its current form. See L. 2013, c. 159, § 1.

Placing to one side the constitutional debate that Gallenthin resolved, the difference in language the Legislature selected for subsections (d) and (e) is revealing. Subsection (d) is stricter in two ways. First, it does not ask whether property could potentially be more useful or valuable; it requires proof of a current problem, such as "dilapidation," "obsolescence," or "overcrowding." Second, subsection (d) does not presume harm; it requires a showing of actual detriment. Additionally, as is the case with subsection (e), proof that a property is not used in an optimal manner or that it could function better is not an independent basis for redevelopment under subsection (d).

## V.

The Township relied on specific parts of subsection (d) for its redevelopment designation. It concluded the Library suffers from "obsolescence," "faulty arrangement," and "obsolete layout." Council Resolution 99-19, at 3; Planning Board Resolution 19-01, ¶ 3. It also found that those conditions have a detrimental effect on the "welfare" of the community. Council Resolution 99-19, at 3; Planning Board Resolution 19-01, ¶¶ 3, 6.

## A.

A presumption of validity attaches to a town's conclusion that an area is in need of redevelopment. 62-64 Main St., 221 N.J. at 157; Levin v. Twp. Comm. of Bridgewater Twp., 57 N.J. 506, 537 (1971). The designation is "entitled to deference provided [it is] supported by substantial evidence on the record." Gallenthin, 191 N.J. at 372-73; see also N.J.S.A. 40A:12A-6(b)(5)(c).

A municipality's discretion "is not unfettered," however. Levin, 57 N.J. at 537. The governing body must "rigorously comply with the statutory criteria" to determine whether property is in need of redevelopment. 62-64 Main St., 221 N.J. at 156. "[M]ore than a bland recitation of applicable statutory criteria and a declaration that [they have been] met" is required. Gallenthin, 191 N.J. at 373. The record must instead contain sufficient credible evidence that the designation satisfies the requirements of the LRHL. ERETC, LLC v. City of Perth Amboy, 381 N.J. Super. 268, 277 (App. Div. 2005).

"Judicial deference does not mean that a court is a rubber stamp." 62-64 Main St., 221 N.J. at 157. Courts "must review the complete record" to assess whether it contains substantial evidence to support a redevelopment designation. Hirth v. City of Hoboken, 337 N.J. Super. 149, 157 (App. Div. 2001).

28

To evaluate the Township's designation, therefore, we consider whether there is substantial evidence that (1) the Library suffers from "obsolescence," "faulty arrangement," or "obsolete layout"; and (2) as a result of one or more of those conditions, the designated area is detrimental to the welfare of the community.

## B.

To be clear, the Township does not claim the Library's condition was "detrimental" to public "safety." See N.J.S.A. 40A:12A-5(d). Nor does the governing body suggest the Library posed harm to the "health" of the community. Ibid. If either were true, the Township would not have allowed thousands of people to use the Library each week.

We therefore turn to the operative terms in subsection (d) that the Township relies on: "obsolescence," "faulty arrangement," and "obsolete layout," which allegedly render the area "detrimental to the . . . welfare of the community."

## C.

### 1.

"Obsolescence" is "the process of becoming obsolete or the condition of being nearly obsolete." Obsolescence, Merriam-Webster's New Collegiate Dictionary 816 (9th ed. 1990); see also Obsolescence, Webster's New

29

International Dictionary 1682 (2d ed. 1950) ("[s]tate or process of becoming obsolete"); Obsolescence, Black's Law Dictionary 1077 (6th ed. 1990) ("[c]ondition or process of falling into disuse").[7] "Obsolete" commonly means "no longer in use or no longer useful." Obsolete, Merriam-Webster's New Collegiate Dictionary 816; see also Obsolete, Webster's New International Dictionary 1682 ("[n]o longer in use; disused"; "neglected"); Obsolete, Black's Law Dictionary 1077 ("[t]hat which is no longer used"). Merriam-Webster's 1990 edition includes, as an alternate definition for obsolete, "of a kind or style no longer current." Obsolete, Merriam-Webster's New Collegiate Dictionary 816.

The Law Division considered those terms in Spruce Manor Enterprises v. Borough of Bellmawr, 315 N.J. Super. 286 (Law Div. 1998). In that case, the governing body designated an approximately thirty-year-old apartment complex as in need of redevelopment because it did not meet "current design standards" relating to the number of units per acre, the number of parking spots, recreational facilities, and handicap accessibility. Id. at 288, 290-91.

The Law Division rejected the town's position. It found those circumstances did not amount to "obsolescence" under subsections (a) or (d) of

---

[7] The relevant language in the LRHL, enacted in 1992, and the Blighted Areas Act, enacted in 1951, is nearly identical. Compare N.J.S.A. 40:55-21.1(d) (repealed), with N.J.S.A. 40A:12A-5(d).

30

N.J.S.A. 40A:12A-5.[8]  Id. at 295.  Pointing to Webster's' definition -- "no longer active or in use, disused, neglected" -- the court stated it "cannot be concluded that the building is obsolete."  Ibid.

The court also found no evidence that "the dated design standards" were "detrimental to the safety, health, morals or welfare of the community" under subsection (d) of N.J.S.A. 40A:12A-5.  Id. at 296.  The court noted the apartment complex was "occupied" and "not in violation of any state or local laws, regulations or ordinances."  Id. at 297.

The court's reasoning was clear:  "Quite simply, the fact that design standards have changed cannot in and of itself render an apartment complex an area of redevelopment under the [LRHL]."  Id. at 296-97.  That was "[c]ertainly [not] the Legislature['s]" intent."  Id. at 297.

Years later, in 2004, the Appellate Division found that Spruce Manor's analysis of "obsolescence" was "instructive."  Concerned Citizens, 370 N.J. Super. at 457.  The underlying case involved properties located in a town's central business district, including a surface parking lot.  Id. at 435-36.  The appellate court found the redevelopment designation of the lot "was supported

_____

[8]  The criteria in subsection (a) are as follows:  "The generality of buildings are substandard, unsafe, unsanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living or working conditions."  N.J.S.A. 40A:12A-5(a).

by substantial evidence of 'obsolescence' detrimental to the . . . community," which satisfied the requirements of subsection (d). Id. at 458. Among other things, the court noted the record demonstrated that the "irregular configuration" and "faulty design" of the parking lot negatively affected the town's tax revenue and economic vitality. Id. at 458-60.[9]

2.

The record lacks substantial evidence that the Library suffered from "obsolescence." At hearings before the Planning Board and the Township Council, both HGA's consultant and the Mayor recognized the Library was a functioning building. And members of the community actively used it more than 150,000 times a year. According to the Strategic Plan, that number was relatively constant. As a result, it can hardly be said that the Library was no longer in use or falling into disuse.

The HGA report and the Architect's Study, to be sure, identified various conditions in the Library that needed improvements or upgrades: lighting, the fire alarm and detection system, HVAC system, roof repairs, ceiling tiles, kitchen appliances, electrical equipment, and ADA accessibility, along with

---

[9] The court's ruling, which pre-dated Gallenthin, also upheld the redevelopment designation under subsection (e). Concerned Citizens, 370 N.J. Super. at 460.

32

other areas. Those conditions are not uncommon in many older buildings in the State. Some reflect ordinary wear and tear and are relatively minor. And none present code violations or pose a hazard, including the presence of capped asbestos.

The fact that an older building needs repair work does not necessarily mean it is out of date or obsolete. The same is true for completed repair work -- in this case, repairs to the brick façade in 2015. Changes in style or design standards, likewise, do not necessarily establish obsolescence under the LRHL.

To the extent the Township asserts that the number of computers and level of programming speak to obsolescence, we analyze the relevant record shortly. Neither the evidence in support of that claim nor other evidence in the record supports a finding that the Library suffered from "obsolescence" within the meaning of subsection (d).

## D.

The Township also relies on two other related phrases in subsection (d) -- "faulty arrangement" and "obsolete layout" -- to support the Library's redevelopment designation.

The HGA report stated that "the library is lacking in additional space to provide the suite of programs, meeting rooms, quiet study areas, and other diverse offerings that its patrons require." More specifically, the report noted

33

the main library floor has only "one small meeting room and an undersized teen area," and the "ground floor meeting room . . . is not well positioned to host regular programs due to its distance from staff and physical separation from the main public portion of the library." The report added that the Library's age and "infrastructure, as demonstrated by the needed electrical improvements, limit the library's ability to provide additional computers, charging stations, and other multi-media offerings."

Related parts of the record offer different information. The West Orange Public Library Strategic Plan, 2016-2019, for example, described the basement storage area as "an untapped resource . . . that could be converted into either multipurpose flexible spaces or office space." It appears from the HGA report that the situation was remedied. Yet the HGA report itself also noted that "[t]he ground floor meeting space is generally not open to the public because it does not have regular staff supervision." And according to the Strategic Plan, the number of library employees in West Orange in 2015 was "the lowest employee total among libraries of a similar size in New Jersey."[10]

Given the state of the evidence in the record, whether there is sufficient proof of "faulty arrangement" or an "obsolete layout" is a close question.

---

[10] The Strategic Plan, in addition, reported that only 23 percent of residents surveyed favored "modernization of [the] entire Library building."

Even if the evidence on that point is considered substantial, however, the record would still have to establish that, as a result of either condition, the Library site was "detrimental to the . . . welfare of the community." N.J.S.A. 40A:12A-5(d). We turn to that requirement next.

E.

"Detriment" refers to "[a]ny loss or harm suffered by a person or property." Detriment, Black's Law Dictionary 565 (11th ed. 2019); Detriment, Black's Law Dictionary 537 (4th ed. 1951) (same). The adjective "detrimental" means "[c]ausing harm, damage, or loss; injurious or hurtful." Detrimental, Black's Law Dictionary 565 (11th ed.). As discussed above, N.J.S.A. 40A:12A-5(d) requires a showing of actual harm; it cannot be presumed.

As used in subsection (d), an area's obsolescence, faulty arrangement, or obsolete layout must be "detrimental to the safety, health, morals, or welfare of the community." N.J.S.A. 40A:12A-5(d). The Township bases its designation solely on detriment to the "welfare" of the community -- a term that is not easily defined. According to Black's Law Dictionary, "general welfare" refers to "[t]he public's health, peace, morals, and safety" -- which has a circular quality when analyzing subsection (d). Welfare, Black's Law Dictionary 1910 (11th ed. 2019).

35

However "welfare" is defined, subsection (d) requires more than a showing that a building could function better, as noted earlier. Here, HGA pointed to the "importance of libraries in the digital age and how modern libraries provide essential services to the community, particularly lower-income residents." Because of its physical obsolescence and layout, HGA stated the Library could not add more computers or programming, and was not "up to the benchmark standard of modern libraries." HGA concluded that "[t]he obsolescence of the library building is detrimental to the welfare of the Township because it inhibits the provision of essential services that promote equity, education, and a sense of community."

To assess how well the Library provided needed services, HGA relied on IMLS benchmarks, that is, data made available by the Institute of Museum and Library Services. HGA concluded "[t]he takeaway from [the] statistics is that" the Library "does not rank well" when compared "to its peers." HGA based its conclusion on the following comparison "to libraries with similar characteristics":

| | Hours | Visits | References | Users | Circulation | Interlibrary Loans To | Programs | Computers |
|---|---|---|---|---|---|---|---|---|
| West Orange | 3,120 | 153,015 | 12,881 | 33,776 | 250,353 | 16,520 | 320 | 32 |
| Mean | 5,794 | 209,203 | 29,579 | 28,243 | 300,513 | 8,947 | 731 | 48 |
| Quartile Rank | Lower Mid | Lower Mid | Lower Mid | Upper Mid | Lower Mid | Top | Bottom | Lower Mid |

36

The HGA report does not explain how the Library's "peers" were identified. But a close review of the first column raises serious questions in that regard. The West Orange Library was open 3,120 hours for the year under review. If the Library was open 7 days a week, then members of the public had access to it slightly more than 8.5 hours a day on average.[11] The mean number of hours for the Library's purported peers is 5,794 -- or an average of nearly 16 hours a day over 7 days. Yet very few libraries, outside of perhaps a few colleges and universities, are open that many hours a day.

As Malanga attempted to establish in his cross-examination of HGA's expert, it is quite possible the IMLS data grouped multiple library branches in other municipalities and compared them to the single branch in West Orange. If that happened, then the mean number of hours in a year for individual libraries would be lower -- as would the number of visits, references, users, circulation, programs, and computers. In that case, the West Orange Library would likely rank higher in each category when compared to towns with only a single library.

---

[11] Until February 1, 2023, the Library's hours were 10:00 a.m. to 9:00 p.m. on Monday, Wednesday, and Thursday; 10:00 a.m. to 5:30 p.m. on Tuesday and Friday; 9:00 a.m. to 5:00 p.m. on Saturday; and 1:00 p.m. to 5:00 p.m. on Sunday -- a total of 3,120 hours in a year, without excluding holidays. See West Orange Public Library, https://www.wopl.org (last visited Mar. 8, 2023).

A simple example clarifies the point. Imagine a town with two libraries that were open for a total of 5,794 hours in a year, that hosted a total of 731 programs, and that had 48 computers. Assuming those figures were evenly split between the two libraries, then each library was open for half the time, hosted half the number of programs, and had half the number of computers. The reduced numbers -- not the combined, larger figures -- would then be factored into the overall data and compared to statistics for West Orange's single library.[12]

Testimony before the Planning Board does not clear up the uncertainty in the record. When asked if the number of hours in the IMLS data reflected one or multiple branches of a library in a given town, HGA's consultant said, "I don't know." When asked "[w]hat criteria" made "a library a peer of the West Orange Library," the consultant said only, "[i]t's a public library." "Anything else?" "No." We reach no conclusion on whether that statement is

---

[12] Statisticians would be right to add that the "mean" data in the IMLS chart involves more than two additional libraries. See Mean, n.3, Oxford English Dictionary Online (3d ed. Mar. 2001), www.oed.com.resources.njstatelib.org/ view/Entry/115436 (last visited Mar. 8, 2023) (defining "mean" as "[t]he average of a set of numerical values, as calculated by adding them together and dividing by the number of terms in the set"). The data might also need to be adjusted for population size and other measures. But the key point of the example remains: if a municipality is counted as a single entity even though it houses more than one library, statistics for "mean" figures will be overstated when compared to a one-library town.

accurate. If it is, that means the Library was compared to urban, suburban, and rural public libraries serving populations of all sizes -- regardless of whether the libraries shared "similar characteristics" with the West Orange Library, as the HGA report says. In addition, the consultant could not explain how the Library compared to other libraries in New Jersey and candidly observed, "[t]hat's a good question. I just don't know."

For our purposes, we find the record does not contain substantial credible evidence that shows how the Library compared to its peers and, in particular, how its programming and the number of computers it had compared to other libraries. The HGA identified those two measures -- "the number of programs that are offered and the number of computers available" -- as "particular areas of concern" in which "the library is poorly ranked." HGA concluded the "low rankings speak to the issue of obsolescence and concerns about their impact on the provision of essential community services." The evidence in the record does not support those conclusions. Defendants do not suggest that a shortfall of computers alone could justify a finding of obsolescence. Their argument is tied to the building's physical limitations, which allegedly prevented the Library from offering more computers.

No one can quarrel with the general point that additional computers and programming at the Library could serve the community better. But that does

not demonstrate that the building was causing actual harm, as the statute requires.

Comments in the record on building repairs appeared to relate to obsolescence, faulty arrangement, and obsolete layout, not to any detriment to the welfare of the community. To the extent the evidence bore directly on detriment, needed repair work does not necessarily establish actual harm. The record contains multiple references, for example, to the collapsed brick façade in 2015. The Township promptly repaired the façade, and the record contains no evidence the problem was likely to recur. Similarly, references to asbestos did not establish actual detriment. The Asbestos Report noted the materials would have to be abated before any renovations might disturb them, and HGA's consultant acknowledged the Library was safe to visit despite the presence of capped asbestos.

The record lacks substantial evidence that the conditions of the Library were detrimental to the community's welfare.

F.

For all of those reasons, we do not find substantial evidence in the record that the Library suffered from "obsolescence," "faulty arrangement," or "obsolete layout" in a way that was detrimental to the "welfare of the

40

community." The Township's designation of the Library as an area in need of redevelopment is therefore invalid.

VI.

In this matter, Township officials offered certain reasons at the outset for pursuing a redevelopment designation: to avoid the public bidding process and keep control over the project. We do not base our judgment on those motives and do not suggest the comments reflect bad faith. Cf. Riggs v. Long Beach, 109 N.J. 601, 613 (1988).

Attempts to avoid public bidding, however, call to mind concerns then-Governor Hughes voiced when he vetoed legislation relating to the sale of public property. See Veto Message to S. 283 1-2 (Nov. 17, 1969). In his veto message, he recommended that "the number of private transactions not subject to public bidding be severely limited." Ibid. He stated that "most sales of public lands or improvements should be fully revealed to public scrutiny by public sale" to allow municipalities to "receive the benefits that usually arise from competitive bidding." Ibid. The Court has likewise noted that public bidding promotes "unfettered competition" and "guard[s] against favoritism, improvidence, extravagance, and corruption." Nat'l Waste Recycling, Inc. v. Middlesex Cnty. Improvement Auth., 150 N.J. 209, 219 (1997) (quoting

41

<u>Terminal Constr. Corp. v. Atl. Cnty. Sewerage Auth.</u>, 67 N.J. 403, 410 (1975)).

Nonetheless, "although [the] sale of public property at public auction is the generally desirable method," redevelopment plans might "be thwarted [or] delayed" if property is not "sold to the developer whose plan had been approved by the redevelopment agency" or governing body. <u>Office of the Governor: News Release</u>, Gov. Thomas Kean (Aug. 3, 1984) (commenting on bills "to permit a municipality to sell property to a developer as part of a specific redevelopment plan").

Towns faced with situations like the one here have a number of options. Among others, they can make needed improvements to public property. They can invite bids for construction projects subject to particular specifications. And they can designate areas in need of redevelopment provided they satisfy the specific standards in the LRHL.

The Township represented at oral argument that it is in the process of building a new state-of-the-art library outside the municipal complex. Nothing in this opinion prevents the Township from achieving that commendable goal. The question here is whether the Township satisfied the legal requirements to redevelop the current Library property under the LRHL.

## VII.

For the reasons set forth above, we reverse the judgment of the Appellate Division.

JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE and JUDGE SABATINO (temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.